**William BOUSQUET, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of the Social Security Administration, Defendant.**

No. CV 99–3850 AJW.

United States District Court,
C.D. California,
Western Division.

Oct. 30, 2000.

Marc V. Kalagian, Lawrence D. Rohlfing Law Offices, Santa Fe Springs, CA, for Willaim Bousquet.

Shirley Wang Hoo, Asst. U.S. Atty., Office of U.S. Atty., Civ. Div., Los Angeles, CA, for Kenneth S. Apfel.

## MEMORANDUM OF DECISION

WISTRICH, United State Magistrate Judge.

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for disability insurance benefits and supplemental security income ("SSI") benefits. Both parties have moved for summary judgment.

### Administrative Proceedings

Plaintiff filed applications for disability insurance benefits and SSI benefits in August 1995, claiming disability since July 17, 1994, due to schizophrenia. [Administrative Record ("AR") 55, 59]. After his applications were denied initially and upon reconsideration, plaintiff received an administrative hearing before Administrative Law Judge Ann Torkington (the "ALJ") on February 18, 1997. [AR 26, 82–114]. Plaintiff failed to appear at the hearing. [AR 28–29]. The ALJ noted that the file indicated that plaintiff was living in his car, but that no mail had been returned as undeliverable. [AR 28–29]. Plaintiff's counsel, Marc Kalagian, appeared at the hearing, but he was unable explain his client's absence. [AR 28–29, 33]. Mr. Kalagian elected to proceed with the hearing on plaintiff's behalf. [AR 29]. Star Vega, Ph.D., a clinical psychologist, testified as a medical expert. [AR 28, 30].

At the conclusion of the hearing, the ALJ adopted Dr. Vega's recommendation that plaintiff undergo further testing, and she ordered an internal medical examination and a psychological evaluation. [AR 50–54]. Plaintiff did not attend his scheduled consultative examinations in March 1997. [AR 14, 213–219]. In May 1997, plaintiff's counsel acknowledged plaintiff's failure to attend the examinations, and advised the ALJ that he had been unable to contact plaintiff. [AR 219–220]. On July 17, 1997, and again on July 22,1997, plaintiff's counsel contacted the ALJ's hearing assistant and requested that the consultative examinations be rescheduled. He advised the hearing assistant that plaintiff was willing to attend the examination and that plaintiff "ha[d] assured counsel that he would appear at this examination." [AR 222; see also Plaintiff's Motion for Summary Judgment at 9 (Declaration of Marc Kalagian) ]. The ALJ did not accede to that request, and proceeded to issue a decision on the record. [AR 14, 222].

In her written decision dated July 25, 1997, the ALJ found that plaintiff had a severe amphetamine-induced psychotic disorder with delusions, and that plaintiff's impairment met the criteria of section 12.09 of the Listing of Impairments. *See* 20 C.F.R., Part 404, Subpart P, Appendix

1, § 12.09. The ALJ further found that drug addiction was a contributing factor material to the determination of disability. *See* 20 C.F.R. §§ 404.1535(a) & (b), 416.935(a) & (b) (explaining that a claimant is not eligible to receive disability benefits if substance addiction is a contributing factor material to the determination of disability, and that substance addiction is not a contributing factor material to the determination of disability if a claimant would still be disabled if he or she stopped using drugs or alcohol). Accordingly, the ALJ concluded that plaintiff was not entitled to benefits. On February 17, 1999, the Appeals Council denied plaintiff's request for review of the ALJ's decision. [AR 4–6].

After the ALJ's unfavorable decision, plaintiff reapplied for disability insurance benefits. [Plaintiff's Motion for Remand at 3]. In a decision dated November 30, 1999, plaintiff was awarded disability benefits due to "anxiety, auditory hallucinations, paranoia, poor concentration and sleep disturbance." [Plaintiff's Motion for Remand, Ex. 1]. Plaintiff was found disabled as of July 26, 1997, the first day following the date of the ALJ's prior unfavorable decision. [Plaintiff's Motion for Remand, Ex. 1].[1]

### Standard of Review

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or if it is based on the application of incorrect legal standards. *Tackett v. Apfel,* 180 F.3d 1094, 1097–1098 (9th Cir.1999); *Reddick v. Chater,* 157 F.3d 715, 720–721 (9th Cir. 1998). Substantial evidence is more than a mere scintilla but less than a preponderance. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Tackett,* 180 F.3d at 1098. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson,* 402 U.S. at 401, 91 S.Ct. 1420 (quoting *Consolidated Edison Co. of New York v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). The Court is required to review the record as a whole, and to consider evidence detracting from the decision as well as evidence supporting the decision. *Verduzco v. Apfel,* 188 F.3d 1087, 1089 (9th Cir.1999); *Andrews v. Shalala,* 53 F.3d 1035, 1039 (9th Cir.1995).

### Plaintiff's Contentions

Plaintiff contends that (1) the ALJ erred in rejecting his treating psychiatrist's diagnosis of schizophrenia in favor of the non-examining medical expert's opinion that plaintiff suffered from an amphetamine-induced psychotic disorder, (2) the ALJ's finding that drug addiction was a contributing factor material to the determination of disability was not supported by substantial evidence, and (3) the Commissioner's finding that plaintiff was disabled beginning on July 26, 1997, constitutes "new and material" evidence warranting a remand.

### Discussion

Plaintiff contends that the ALJ erred in rejecting the opinion of Dr. Steve Rahimi, plaintiff's treating psychiatrist at Pacific Clinic, in favor of the opinion of Dr. Star Vega, the medical expert.

Plaintiff first sought treatment at Pacific Clinic on January 18, 1995, for depression, auditory and visual hallucinations, suicidal ideation and threats, and insomnia. [AR 185–187; *see also* 157–158]. On that date, plaintiff reported that he was using amphetamines daily. [AR 188–189]. Plaintiff's primary intake diagnosis was psychotic disorder NOS (not otherwise specified), and his secondary diagnosis was amphetamine delusional disorder. [AR 189]. Plaintiff was transferred to Penn Mar Therapeutic Center for further

---

**1.** Pursuant to the Commissioner's internal operating procedures, a claimant may file a new application for benefits while judicial review of a prior decision denying benefits is pending. In that event, the ALJ and the Appeals Council will limit their consideration to the period following the period covered by the prior decision that is undergoing judicial review. [*See* Plaintiff's Motion for Remand, Ex. "I–4–230" (the HALLEX Manual, section I–4–230)].

evaluation and treatment, and was hospitalized there from January 19 until January 24, 1995. [AR 156–158]. Plaintiff reported a history of psychiatric symptoms, including chronic depression, hearing voices, mood swings, feelings of worthlessness, and the use of amphetamines "off and on for the last nine years." [AR 157]. Plaintiff was placed on medication (Haldol, Cogentin, and Desipramine) to "ameliorate his psychotic symptoms" and "lift his depression." [AR 156]. He was discharged with the following diagnoses: psychotic disorder not otherwise specified, depressive disorder not otherwise specified, probable bipolar affective disorder depressed with psychotic feature, and a history of amphetamine abuse. [AR 156]. The discharge summary noted that plaintiff would seek follow-up treatment at Pacific Clinic. [AR 156].

In June 1995, plaintiff returned to Pacific Clinic, where he was evaluated by Dr. Rahimi. [AR 178–185, 190–197]. Plaintiff stated that he was not taking any medication at that time, and he denied current use of alcohol or drugs. [AR 179]. Dr. Rahimi noted that plaintiff reported auditory and visual hallucinations and paranoid delusions of telepathy. [AR 178–180]. Dr. Rahimi completed a "Change of Diagnosis Form" revising plaintiff's primary diagnosis from psychotic disorder NOS to "schizophrenia CPT acute exac[erbation]," and his secondary diagnosis to "schizoaffective disorder." [AR 184]. Dr. Rahimi ordered lab tests and prescribed psychotropic medications, including lithium carbonate. [AR 178, 198].

For the next year, plaintiff saw Dr. Rahimi approximately every four to six weeks for monitoring and adjustment of his medications. [AR 161–183]. The progress notes from that period include only two references to possible substance use. In March 1996, after plaintiff had been in treatment for nine months, Dr. Rahimi wrote that plaintiff "said he is not on drugs/ETOH [alcohol] any more." [AR 166]. In May 1996, plaintiff "claim[ed] he had 'street meth' 1x/4 weeks ago 'just to stay awake.' Denied ETOH or other drugs." [AR 165]. Throughout the period from June 1995 through June 1996, plaintiff reported ongoing psychotic symptoms, including persistent auditory hallucinations and delusions.[2] The treatment notes reflect that plaintiff experienced only transient or partial improvement from his medications. [*See, e.g.,* AR 164, 165, 170, 173].

In January 1996, Dr. Rahimi noted that plaintiff had told him he had twice been denied SSI. [AR 168]. Dr. Rahimi noted that plaintiff "is gravely disabled & I wonder why SSI keep[s] rejecting such a psychotic pt." [AR 168]. In a June 1996 progress note, Dr. Rahimi noted that plaintiff "was hospitalized at PM [Penn Marr] Hosp. for 17 days. He is happy that he is outside of hospital. He states that he has been living in his car for the past two months." [AR 164]. In July 1996, Dr. Rahimi completed a "Mental Work Restriction Questionnaire" listing plaintiff's primary and secondary diagnoses as schizophrenia CPT acute exacerbation and schizoaffective disorder. [AR 161]. Given a range of "none" to "severe,"

---

**2.** During this period, plaintiff stated that he heard voices constantly, including those of Satan and Charles Manson. [*See, e.g.,* AR 170, 176; *see also* AR 118–144 (plaintiff's disability reports)]. Plaintiff also suffered from delusions, as reflected in Dr. Rahimi's notes:

"There is a battle going on in my head." The war is between God and [the] devil, deciding about the world. .The voice causing to blow up [sic] his soul and he feels his body and arms raised to the shape of a cross. He extends his arms up to his side

showing the cross. He talks about seeing things, "some one crowns me," [he] sees souls and headless cross. The voices tell him he is reincarnated, is son of King Tut and [he] sees the "treasures in Whittier." He states the son of King Tut was kidnaped, his sperms taken out, made [a] new generation.

[AR 164]. Plaintiff further reported that he was having marital and family problems and was separated from his wife. [AR 129, 166, 170, 174].

Dr. Rahimi indicated that plaintiff had a "severe" impairment in all of the work-related abilities rated. [AR 161–162]. He also described plaintiff's prognosis as "poor." [AR 162].

The ALJ rejected Dr. Rahimi's diagnosis of schizophrenia, and instead relied on the opinion of Dr. Vega, the medical expert. Dr. Vega agreed that plaintiff was disabled by his psychosis, but she concluded that plaintiff's diagnosis was "amphetamine-induced psychotic disorder with delusions." [AR 36]. The ALJ's reasons for rejecting Dr. Rahimi's opinion and accepting that of Dr. Vega can be summarized as follows: (1) the change in the treating diagnosis from amphetamine-induced psychotic disorder to schizophrenia or schizoaffective disorder indicates some uncertainty in the diagnosis [AR 14, 49–50]; (2) an amphetamine-induced psychotic disorder can mimic schizophrenia or a psychotic disorder of some kind [AR 14, 30]; (3) the evidence regarding plaintiff's drug use after October 1995 does not clearly show that he had stopped using drugs altogether, and therefore the proper inference is that he continued to use amphetamines [AR 14, 30, 34–35, 41]; (4) the history of plaintiff's illness is not fully consistent with a diagnosis of schizophrenia because he did not have a breakdown or manifest schizophrenic symptoms in adolescence [AR 14, 31, 47–49]; (5) amphetamine-induced psychotic disorder is more consistent with the evidence of record [AR 14, 34]; and (6) the record does not conclusively show that plaintiff has suffered any permanent brain damage from amphetamine use that would warrant a finding that plaintiff would still be disabled if he stopped using drugs. [AR 14, 31–32, 36–37, 50].

■ The opinion of a treating physician is entitled to greater weight than that of a non-treating physician because the treating physician " 'is employed to cure and has a greater opportunity to know and observe the patient as an individual.' " *Morgan v. Commissioner of the Social Security Administration,* 169 F.3d 595, 600 (9th Cir.1999) (quoting *Sprague v.*

*Bowen,* 812 F.2d 1226, 1230 (9th Cir.1987)). To reject a treating physician's opinion in favor of a conflicting examining physician's opinion, or to reject an examining physician's opinion in favor of a conflicting non-examining physician's opinion, the ALJ must set forth "specific and legitimate" reasons for doing so, and this decision must itself be based on "substantial evidence." *Smolen v. Chater,* 80 F.3d 1273, 1285 (9th Cir.1996); *Andrews,* 53 F.3d 1035, 1041 (9th Cir.1995). "The opinion of a non-examining medical advisor cannot by itself constitute substantial evidence that justifies the rejection of the opinion of an examining or treating physician." *Morgan,* 169 F.3d at 602. The ALJ, however, may rely on a medical advisor's testimony to reject a treating or examining physician's opinion when there is other substantial evidence in the record to support the medical advisor's testimony. *See Morgan,* 169 F.3d at 602–603; *Nguyen v. Chater,* 100 F.3d 1462, 1466 (9th Cir.1996).

■ The ALJ's reliance on Dr. Vega's testimony to reject Dr. Rahimi's diagnosis was misplaced in several respects. First, Dr. Vega prefaced her testimony by stating that she did not have enough information to reach a definitive conclusion with respect to plaintiff's diagnosis. [*See* AR 30–34, 37]. On the basis of the documentary evidence before her, Dr. Vega concluded that the most fitting diagnosis of plaintiff's condition was an amphetamine-induced psychotic disorder. [AR 34]. Unlike Dr. Rahimi, however, Dr. Vega never saw plaintiff in person, never examined or treated him, never heard plaintiff describe his symptoms, history, or reactions to medications, and never had the opportunity to question plaintiff. *See Lester v. Chater,* 81 F.3d 821, 833 (9th Cir.1995) (explaining that the Commissioner is required to give weight not only to the treating physician's clinical findings and interpretation of test results, but also to his subjective judgments, and that the treating physician's "continuing relationship with the claimant makes him especially qualified to

evaluate reports from examining doctors, to integrate the medical information they provide, and to form an overall conclusion as to functional capacities and limitations, as well as to prescribe or approve the overall course of treatment").

It is true, of course, that plaintiff's failure to appear at the hearing and for his consultative examinations is the primary reason that the record lacks evidence that might definitively contradict or corroborate the treating physician's diagnosis. Plaintiff's failure to cooperate cannot be condoned, but neither can the totality of the circumstances be ignored. The ALJ conceded that plaintiff was disabled by a mental impairment during the period when he failed to appear at the hearing and at his consultative examinations; the disputed issue was whether substance abuse was a "contributing factor" material to that determination. The Commissioner subsequently found that plaintiff was disabled by a mental impairment independent of any drug as of July 26, 1997, only a few months after the hearing. The ALJ also noted that there was evidence in the record indicating that plaintiff was, or had been, living in his car at some point before the hearing.

The Commissioner's regulations state that "[w]e will consider your physical, mental, educational, and linguistic limitations" in determining whether a claimant had a good reason for failing to attend a consultative examination. 20 C.F.R. §§ 404.1518(a), 416.918(a). If a claimant has a good reason for failing to appear, "we will schedule another examination." 20 C.F.R. §§ 404.1518(a), 416.918(a). There is no indication that the ALJ considered whether plaintiff had a good reason for failing to attend his consultative examinations. Similarly, the regulations provide that an ALJ may not dismiss a request for hearing unless *both* the claimant and the claimant's designated representative fail to appear at the hearing, and then only if the ALJ finds that good cause does not exist for the default, considering the claimant's "physical, mental, educational, and linguistic limitations ...." 20 C.F.R.

§§ 404.957(b), 416.1457(b). No sanction is authorized where, as here, the claimant's representative appears at the hearing, but the claimant does not.

■ The Ninth Circuit also has held that a claimant's mental impairment must be taken into account in evaluating a claimant's ability to comply with procedural requirements and prosecute his or her claim. In *Higbee v. Sullivan,* 975 F.2d 558 (9th Cir.1992) (per curiam), for example, the claimant was a paranoid schizophrenic who refused to provide information verifying his continued eligibility for SSI benefits, despite being given the opportunity to do so before and during the hearing. The court observed:

> Ordinarily, we might affirm the Secretary's decision to declare Higbee ineligible for benefits on this ground. [¶] The difficulty in this case is that ... Higbee's failure to cooperate appears to be due to the very factor that rendered him eligible for SSI benefits in the first place, his serious mental illness....
>
> .    .    .    .    .
>
> [I]t would be contrary to the purpose of the S.S.I. program to affirm the Secretary's decision as based on Higbee's failure to cooperate, when the record suggests the failure may be due to the very mental illness that rendered Higbee eligible for benefits. Prior to taking such a drastic step, we believe it was incumbent on the A.L.J. to continue the administrative hearing so S.S.A. personnel could investigate whether there were any other ways to determine where Higbee resided. "The administrative law judge may stop the hearing temporarily and continue it at a later date if he or she believes that there is material evidence missing at the hearing." 20 C.F.R. § 416.1444. Perhaps a friend, relative or social services provider could provide the missing evidence as to where Higbee lived; perhaps Higbee might be convinced to consult someone he trusted before the new hearing; perhaps Higbee would simply be more co-

operative, as many mentally ill persons behave erratically; perhaps Higbee might be convinced to obtain legal representation or a legal representative might be asked to participate as an amicus. The burden on the S.S.A. of continuing the hearing is minimal compared to the dire consequences that might befall a mentally ill, apparently homeless, S.S.I. recipient if his source of support were cut off erroneously. A person unable to meet the minimal burden of providing information to establish his continuing eligibility is unlikely to be able to meet the much higher procedural barrier to applying for benefits anew.

*Higbee,* 975 F.2d at 561, 562–563. Although plaintiff is not faced with termination of benefits, *Higbee's* rationale applies to this case. *Cf. DeLorme v. Sullivan,* 924 F.2d 841, 849 (9th Cir. 1991) (noting that "mentally ill persons may not be capable of protecting themselves from potential loss of benefits by furnishing necessary evidence"); *Vidal v. Harris,* 637 F.2d 710, 714 (9th Cir. 1981) (remanding the case because the mentally ill claimant was "totally incapable" of challenging the vocational expert's conclusions). Because "the record suggests the failure [to cooperate] may be due to the very mental illness that rendered [plaintiff] eligible for benefits," the ALJ was not free to disregard the ambiguities in the record that caused Dr. Vega to qualify her opinion.

■ Moreover, plaintiff's failure to attend the hearing and his scheduled consultative examinations did not necessarily exonerate the ALJ from taking additional steps to develop the record. The ALJ has an independent duty to develop the record, and that duty exists even when the claimant is represented by counsel. *See Crane v. Shalala,* 76 F.3d 251, 255 (9th Cir.1996) (citing *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir.1983)); *Booz v. Secretary of Health and Human Services,* 734 F.2d 1378, 1381 (9th Cir.1984); *see also Sims v. Apfel,* 530 U.S. 103, 120 S.Ct. 2080, 2085, 147 L.Ed.2d 80 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.") (citation omitted). The ALJ's duty to develop the record is heightened when a claimant's ability to protect his or her interests is adversely affected by a mental impairment. *See Higbee,* 975 F.2d at 561–62.

The ALJ did not explore other options for clarifying the evidence that Dr. Vega characterized as ambiguous or inadequate. For instance, Dr. Vega testified that she was unsure why Dr. Rahimi had changed plaintiff's diagnosis to schizophrenia. [AR 36–37, 44–45, 49–50]. She also questioned the accuracy of Dr. Rahimi's observations about plaintiff's drug use, yet she admitted that seeing patients in a "clinical setting"—as Dr. Rahimi had plaintiff—would be helpful in evaluating the candor of a patient's statements about drug use. [AR 42–44]. If the ALJ agreed that the basis for Dr. Rahimi's opinion was unclear, she could have attempted to obtain further information from him. *See Smolen,* 80 F.3d at 1288 (explaining that the ALJ had a duty to "conduct appropriate inquiry" if he needed to know the basis for the treating physician's opinion); 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1) (authorizing the acquisition of additional information from a claimant's treating physicians where the record is inadequate to make a determination); 20 C.F.R. §§ 404.944, 416.944 (stating that the ALJ may continue the hearing if he believes material evidence is missing, and may reopen the hearing at any time prior to mailing a notice of decision to receive new and material evidence); 20 C.F.R. §§ 404.950(d), 416.1450(d) (providing that the ALJ may issue subpoenas on his own initiative or at the request of a party); Social Security Ruling ("SSR") 96–5p, 1996 WL 374183, *6 ("Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from

the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion."); SSR 96–2p ("[A]dditional development required by a case—for example, to obtain more evidence or to clarify reported clinical signs or laboratory findings—may provide the requisite support for a treating sources medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between a treating source's medical opinion and the other substantial evidence in the case record.").

There are other reasons to question the foundation for Dr. Vega's opinion and to conclude that her testimony does not provide a sufficient basis for the ALJ's rejection of the treating physician's diagnosis and opinion. For example, the fact that when he began treating plaintiff in June 1995, Dr. Rahimi changed plaintiff's primary diagnosis from "psychotic disorder NOS" (which had been made by someone else) to schizophrenia, does not support the inference that the diagnosis of schizophrenia was inaccurate. If anything, the evidence suggests that Dr. Rahimi refined the initial NOS diagnosis based on the additional history and clinical observations gleaned during plaintiff's June 1995 visit. [See AR 184–197]. In addition, although he plainly was aware of plaintiff's history of amphetamine abuse, Dr. Rahimi totally abandoned the secondary diagnosis of amphetamine-induced disorder.[3] Dr. Rahimi reaffirmed his diagnoses of schizophrenia and schizoaffective disorder after he had been treating plaintiff for a year, and there is nothing to suggest that he deviated from those working diagnoses during the time he treated plaintiff. [AR 161].

Dr. Vega also reasoned that an amphetamine-induced psychotic disorder could "mimic" schizophrenia. Even if true, that does not mean that the diagnosis of schizophrenia was incorrect, but merely that there was a plausible alternative diagnosis.

As the treating psychiatrist who saw plaintiff regularly, Dr. Rahimi was in a far better position than Dr. Vega to decide which diagnosis was more appropriate. Dr. Rahimi had available to him all of the documentary evidence and findings that Dr. Vega reviewed, plus the firsthand knowledge that he had gained from treating plaintiff that could not be distilled in his progress notes. Absent valid reasons for questioning Dr. Rahimi's diagnosis, his judgment that plaintiff suffered from schizophrenia—rather than from an alternative condition—is entitled to deference. *See Andrews,* 53 F.3d at 1040 (stating that where a nontreating source's opinion contradicts that of the treating physician but is not based on independent clinical findings, or rests on clinical findings also considered by the treating physician, the opinion of the treating physician may be rejected only if the ALJ gives specific, legitimate reasons for doing so that are based on substantial evidence in the record).

Dr. Vega also appears to have overlooked evidence that plaintiff's symptoms began to manifest themselves in adolescence. In connection with plaintiff's benefits application, a disability interviewer noted that plaintiff "tried to commit suicide at age 16—hosp @ Whittier Presbyterian. At 'Child Guidance' a few months. Admits to auditory hallucinations in 1980's." [AR 123]. Dr. Rahimi also noted that "plaintiff has been paranoid and was hearing voices after high school." [AR 178]. In addition, plaintiff admitted that his amphetamine use began in at the end of high school, and he stated that his father had mental illness. [AR 140, 191].

Dr. Vega also observed that the evidence about plaintiff's drug use after October 1995 was unclear, and from that ambiguity in the record she inferred that plaintiff continued to use amphetamines.

**3.** Similarly, plaintiff's January 1995 discharge summary from Penn Marr Therapeutic Center lists a history of amphetamine abuse, but the discharge diagnoses (psychotic disorder NOS, depressive disorder NOS, and probable bipolar affective disorder) do not include amphetamine-induced psychotic disorder. [AR 156].

The record reflects that in January 1995 and again in October 1995, plaintiff admitted to daily amphetamine use. [AR 134, 188]. In June 1995, however, when he sought help at Pacific Clinic, he denied current use of alcohol or drugs. [AR 179–180]. Dr. Rahimi's notes after October 1995 make no mention of substance abuse (or suspected abuse) until March 1996, when plaintiff again denied drug or alcohol use. [AR 166]. In May 1996, however, plaintiff admitted to using "street meth" one time a month before. [AR 165]. There was no evidence regarding plaintiff's drug use after July 1996.

Based on this record, Dr. Vega testified, "I must assume that this man has been continuing to take amphetamine if he was using them on a daily basis, as a matter of fact." [AR 34–35]. Dr. Vega acknowledged, however, that "the treating doctor does not at all refer to any kind of ingestion of any substance like that and does list significant symptoms such as artificial hallucinations, paranoia, insomnia … and he lists very severe symptoms throughout the record." [AR 35]. Dr. Rahimi did not intimate that plaintiff's symptoms were due to substance abuse, and he clearly concluded that plaintiff had an organic mental illness. Nonetheless, Dr. Vega opined that plaintiff did not have any organic mental disorder, and that his psychotic symptoms were induced by daily amphetamine use. Taken as a whole, the post-October 1995 evidence does not support Dr. Vega's conclusions.

The ALJ did not go so far as to find that plaintiff used drugs daily. Instead, she found that "the medical evidence of record thus does not clearly show that the claimant has stopped using drugs regularly." [AR 14]. That equivocal finding offers only limited support for her ultimate conclusion that plaintiff's psychotic symptoms were due to ongoing, active substance abuse, rather than to any underlying mental illness. Thus, even if plaintiff's drug use continued or recurred after June 1995, the ALJ erred in concluding that plaintiff did not have a disabling organic mental disorder, and consequently erred in finding

that his substance addiction was a contributing factor material to the disability determination.

Rather than reschedule plaintiff's consultative examinations or avail herself of any of the options available to clarify the basis for the treating physician's opinion, the ALJ elected to proceed and render her decision on the record. Having made that election, the ALJ could not ignore the deficiencies in Dr. Vega's testimony and Dr. Vega's admission that she lacked sufficient information to render an informed opinion.

**Remand or award benefits**

■ The choice whether to reverse and remand for further administrative proceedings, or to reverse and simply award benefits, is within the discretion of the Court. *See Harman v. Apfel,* 211 F.3d 1172, 1176 (9th Cir.2000), *pet. for cert. filed* (August 2, 2000) (holding that the district court's decision whether to remand for further proceedings or payment of benefits is discretionary and is subject to review for abuse of discretion). Remand is appropriate where additional proceedings would remedy defects in the ALJ's decision, *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir.1989), and where the Commissioner is in a better position to evaluate the evidence. *Marcia v. Sullivan,* 900 F.2d 172, 176 (9th Cir.1990). An award of benefits is appropriate where no useful purpose would be served by further administrative proceedings, *see Gamble v. Chater,* 68 F.3d 319, 322–323 (9th Cir.1995), where the record has been fully developed, *see Schneider v. Commissioner of the Social Security Administration,* 223 F.3d 968, 976 (9th Cir.2000); *Ramirez v. Shalala,* 8 F.3d 1449, 1455 (9th Cir.1993), or where remand would unnecessarily delay the receipt of benefits. *See Smolen,* 80 F.3d at 1292.

■ Remand for an award of benefits, rather than for further proceedings, is appropriate where (1) the ALJ has failed to provide legally sufficient reasons for rejecting the opinion of a treating or examin-

ing physician, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Harman,* 211 F.3d at 1178. Here, the ALJ has not provided legally sufficient reasons for rejecting the opinion of the treating physician, Dr. Rahimi, that plaintiff's disability was caused by schizophrenia, and the ALJ improperly credited the non-examining medical expert's opinion that plaintiff's impairments were due to an amphetamine-induced psychotic disorder.

There are no outstanding issues to be resolved before a determination of disability can be made. It is not disputed that plaintiff's impairments were disabling; the issue is whether plaintiff's impairments would have persisted if he stopped using drugs. *See* 20 C.F.R. §§ 404.1535(b), 416.935(b); *Sousa v. Callahan,* 143 F.3d 1240, 1245 (9th Cir.1998). Other than Dr. Vega's testimony, there is no evidence in the record that would justify rejecting Dr. Rahimi's primary diagnosis of schizophrenia, which was first made in June 1995. [AR 184]. No purpose would be served by remanding the case for a consultative examination because plaintiff's present condition is not in dispute, and such an examination would have little probative value concerning plaintiff's condition and diagnosis during the period before July 26, 1997. Dr. Rahimi's treatment relationship with plaintiff is well-documented, and his progress notes and findings are adequate to support his opinion that plaintiff's impairments were due to an organic mental disorder. There is no suggestion that additional treatment records or other medical evidence exists pre-dating the evidence already in the record. Under these circumstances, remanding for further testimony from a medical expert regarding the disability onset date would needlessly protract this case and delay the payment of back benefits. Accordingly, plaintiff is en-

titled to a finding that he became disabled from a mental impairment beginning in June 1995, and the matter is remanded to the Commissioner to determine the appropriate award of benefits based on plaintiff's applications for disability insurance benefits and SSI filed in August 1995.[4]

### Conclusion

For the reasons stated above, plaintiff's motion for summary judgment is **granted,** defendant's motion for summary judgment is **denied,** and the case is remanded to defendant for payment of benefits.

**IT IS SO ORDERED.**

---

4. In light of this disposition, it is unnecessary to address plaintiff's contentions regarding

remand for the consideration of new and material evidence.